## Case No. 17,120.

WALTER et al. v. The MONTGOMERY.

[3 Hunt, Mer. Mag. 153.]

District Court, S. D. Florida. March 7, 1840.

SALVAGE — COMPENSATION — FLORIDA COAST—AD-
MIRALTY JURISDICTION—SURVEY AND
CONDEMNATION.

[1. Salvage services rendered by professional wreckers, who constantly maintain outfits suitable for the purpose, in places (such as the Florida coast) where the interests of commerce require it, are to be more liberally rewarded than like services would be if rendered in other places, and by persons and vessels pursuing other avocations.]

[2. One-fourth, being $10,178, allowed to professional wreckers for getting a ship and cargo of cotton off the Florida reef, by transferring cargo to their vessels; the ship being considerably damaged and in some danger, the services lasting about 10 hours, and being without danger or risk to the salvors.]

[3. Admiralty courts have jurisdiction to order a survey and decree a condemnation and sale of the ship; but, before doing so, the judge should be satisfied that the application is made in perfect good faith towards all parties interested, and that the vessel is so damaged that no prudent man would think of repairing her.]

In admiralty.

MARVIN, District Judge. This is a suit, instituted by John Walter, on his own behalf, and on the behalf of fifty-five others associated with him, against the ship Montgomery and cargo, claiming salvage for services rendered them upon the high seas. The material facts of the case are briefly these: The ship Montgomery, of Portsmouth, Grace, master, bound on a voyage from Mobile to Havre, in France, on the 30th of January last, ran ashore upon that part of the Florida reef known as Carysford's reef. The master carried out his anchors, set his sails aback, and used all the means in his power to get his ship off the reef without discharging any of his cargo. While he was making these efforts, the present libellants, who are licensed wreckers on

the coast, offered him their assistance, which he declined, under the impression that he would succeed without assistance in the extricating his ship from her dangerous situation. He continued his exertions during that day, the ensuing night, and a part of the following day, but to no purpose. The ship still remained hard and fast upon the rocks. The master, having now become satisfied that his ship could not be gotten off without lightening, accepted the assistance of the wreckers. They lightened the ship by transshipping aboard their vessels two hundred bales of cotton; and, in about ten hours, succeeded in getting the ship afloat, and safely moored inside of the reef. They then got her under way, and navigating her through an intricate and winding channel into the Gulf, brought her to this port. Her situation on the reef was somewhat dangerous. She had run across the outer reef, and progressed some distance through a narrow channel, surrounded by rocks and shoals. Yet these did not so far protect her from the waves as to prevent her thumping and grinding heavily upon the bottom. She suffered considerable injury. Her keel was badly split; upper deck started; several beams were broken, and she was otherwise much strained and injured.

The first question to be considered in this case is, what is a reasonable salvage, under the circumstances, to be decreed the libellants for their services? Our law has fixed no standard by which to measure compensation to salvors. It is left to the discretion of the judge; not, indeed, to an arbitrary and capricious, but to a sound and reasonable discretion, to be exercised upon a careful consideration of all the circumstances; and upon consulting, as far as they are applicable, the decrees and opinions of other judges in analogous cases. Before, therefore, I enter upon the particular consideration of this question, it will be expedient to review briefly some of the leading cases of salvage, decided in England and this country, with a view to learn, not only the proportions decreed in each case, but also the motives which induced their adoption. Such a review will aid us in arriving at a just decision of the present case.

It was the ancient practice of the English and American courts of admiralty to decree the one moiety to the salvors, in all cases of derelict. But this practice has long since been discarded, and derelict and other cases of salvage are now considered as governed by the same general principles. In a case of derelict, where the services of the salvors were highly meritorious, Sir William Scott decreed them two-fifths of the value of the property saved, the whole being valued at £12,000. The Aquila, 1 C. Rob. Adm. 42. In another case, where the ship had struck upon a rock on the coast of England, beaten in bottom, lost her rudder, and was abandoned by her master and crew, and was gotten off by the salvors, and a quantity of bullion saved from her, when she

sank, and was again weighed up by them, and taken into port, the judge decreed the salvors sixty per cent. upon the amount saved, including the bullion; the whole being £3.400. 5 C. Rob. Adm. 322. In the case of The William Beckford, the ship and cargo were saved from imminent peril, although but little time and labor were expended. They were valued at £17,604. The judge decreed £1,000 to the principal salvors; £50 to the owners of three boats and smacks; and 10 guineas apiece to two boys. 3 C. Rob. Adm. 355. In another case of much merit, the one-tenth of £72,000 was decreed to the salvors. 1 Dod. 414. The salvors, in the case of The Salacia, were highly commended for their good conduct by Sir Christopher Robinson, but their compensation was by no means proportioned to the value of their services. The case was this: The British ship Salacia, while on a voyage from Hull to Lima, put into West Point Bay, in Great Falkland Islands, on the 11th of May, 1826, for a supply of water, where she was driven on shore four times. On the 20th of May, she struck upon the rocks, and was thrown upon her beam ends; and in this situation was found on the 12th of June, by the American ship Washington. Captain Percival, of the Washington, after making a survey of the Salacia, with his crew, and the crew of the Dart, (who had previously been wrecked on the Falkland Islands,) undertook the release of the Salacia, which, after unlading half of the cargo, was effected on the 21st of June; and, on the following day, she was moored in the bay. By the 28th her cargo was reshipped, and on the 7th of July she was ready for sea, and proceeded on her voyage to Valparaiso, where proceedings for salvage were instituted, and a reference was made to arbitrators, who awarded £600, being the one-fourth of the value of the ship as the salvage of the ship; and it was then agreed between the parties that the question of the salvage upon the cargo should be decided by the high court of admiralty in England. The cargo was valued at £38,000. The judge allowed £1,000 to the owners of the Washington and other persons interested, for the loss of the sealing voyage, occasioned by the detention in assisting the Salacia, and £1,500 as a remuneration to the salvors for their services. 2 Hagg. Adm. 262.

Among the cases decided in the courts of our own country, that of The Blaireau [Case No. 9,230] is a leading one. This ship, during the night, was run down at sea, and before morning, had three feet of water in her hold. She was deserted by all her crew except one, who, at first from compulsion, but afterwards from choice, remained on board and endeavored to save her. In this situation she was found by the ship Firm, and with great labor and fatigue, navigated nearly three thousand miles into port. The sales of the Blaireau and cargo amounted to $60,270. The supreme court decreed $21,400 salvage. 2 Cranch [6 U. S.] 240. The case of The Cora was decided by Justice

Washington, in the circuit court of Pennsylvania [Case No. 1,621]. It resembles the case of The Blaireau in all of its material circumstances. The brig was found deserted at sea, by the master of the brig Ceres, who put on board of her his mate and two mariners. They got her under way, and after encountering a violent gale, succeeded in bringing her safely into Delaware Bay. The gross amount of the sales of the brig and cargo was $47,300. The court decreed the one-third of this amount as a reasonable salvage. The case of Hobart v. Drogan [10 Pet. (35 U. S.) 108] was decided in the supreme court in 1836. The case was this: The brig Hope, with a valuable cargo, was lying in Mobile Bay, when a hurricane came on. The brig parted her anchors, and was driven on a shoal, outside of the Point, among the east breakers, and forced on her beam ends. Her masts and bowsprit were cut away. The master and crew deserted her to save their lives. Two days after she was stranded, the libellants, who were all pilots of the outer bar, after making various fruitless efforts, succeeded in getting the brig off and towing her up to Mobile. On a libel for salvage, the district court decreed the libellants the one-third of $15,299.58, the appraised value of the brig and cargo. The owners appealed, and the supreme court thought the salvage was reasonable, and affirmed the decision.

The attempt was made at the bar to compare the case now before the court to the cases I have cited; and it was claimed, that as high a rate of salvage should be decreed in this case, as in any of those. But it appears to me, that there are but few material points of comparison. In nearly all of the cases cited, the vessels saved have been abandoned by their respective masters and crews. They were saved at the expense of much labor and fatigue; and, in some of the cases, of personal danger also. In the present case, the master and crew remained by the ship. There was no danger in saving the ship and cargo, nor great labor or fatigue. The claim, therefore, to as high a rate of salvage in this case, as in those, if sustained at all, must be sustained upon other grounds than those of analogy. There have been numerous cases decided in this court, by my predecessor, that possess a striking resemblance to the present. One of the first, is that of The Nauna [unreported], decided in 1828. This barque, during the night, ran ashore upon Carysford's reef. In the morning three wrecking vessels, lying near by, offered their assistance, which was accepted. The wreckers lightened her, by transhipping aboard their vessels 456 bales of cotton, when she swung off the reef. They were employed in this service about twenty hours. The barque and cargo were valued at $60,000. The judge decreed $10,000 salvage. The case of The Hector [unreported] was decided in 1833. This ship got ashore on Conch reef. The weather was calm, and continued so for several days after the ship was gotten off. Four wrecking vessels

and their crews were employed to relieve the ship. After loading two of their vessels from her cargo, they succeeded in heaving her off the reef. The master insisted, at the trial, that his ship was in no immediate danger; that he accepted the assistance of the wreckers as a matter of prudence and precaution, and not because he supposed their services were absolutely necessary to the safety of the ship and cargo; that, as the weather continued favorable, he might have removed the cargo, and got at and thrown overboard his ballast; and in this way lightened, and hove his ship off, without the assistance of the wreckers. The judge did not regard the ship, under the circumstances, as in great danger; yet he thought the prompt and active exertions of the wreckers entitled them to a fair and reasonable compensation; and that $10,000 was not an unreasonable recompense, the ship and cargo being valued at $70,000. The Austerlitz [unreported] was decided in 1837. This ship got ashore in the night, in calm weather, and remained on the reef three days, before the master would take assistance. During this time, he carried out his anchors, and used all his exertions to get his ship off, but without success. He then employed the wreckers to lighten and get the ship off. They transhipped aboard their vessels 400 bales of cotton, and she came off. The weather continued calm for several days after the ship was relieved. The cargo consisted of 1567 bales of cotton, valued at $61,740. The judge decreed to the salvors 300 bales, valued at $11,800. The case of The Ella Hand [Case No. 4,369] was decided the same year. It was like the case of The Austerlitz in all its material circumstances. The ship ran ashore on the Tortugas. The weather was calm, and continued so for several days after the vessel was relieved. The wreckers lightened her, by loading two of their vessels, and hove her off. The ship and cargo were valued at $33,200. The master contended, at the trial, that he might have saved his ship, and the greater part of his cargo, by throwing overboard a portion of it, of little value. The judge agreed, that the master might have saved the ship and the greater portion of his cargo by a jettison of : part of it; but he said, "that experience had taught him, that masters generally delay this operation until it is too late to be available to them." He decreed the wreckers $7,000 salvage.

These and many other cases, which might be cited, decided by Judge Webb, very much resemble the present one. In all, the weather was favorable, and the vessels and cargoes were in no imminent peril; yet in each they would have been in great peril upon a slight change of weather; and, in all, the services were performed without risk, and by the same class of persons. It will be readily seen, that the amount of salvage decreed in the several cases cited, from the English and American Reports, and from the rolls of this court, far exceeds a compensation pro opere et labore, and any peril encountered by the salvors. Indeed,

in many of these cases there is an apparent prodigality in rewarding the salvors, that can be justified only by some potent consideration. Why should salvors be so largely rewarded for their services? If life or property is saved from imminent destruction on land, no reward except simply for the work and labor done and not often that, is paid or demanded. Let similar services be performed at sea, and a most liberal and sometimes even extravagant reward is given. Why is this difference? Why is the marine salvor so generously rewarded? It is because an enlightened public policy deems the interests of commerce and navigation best promoted by decreeing a liberal recompense to salvors; not for the sole purpose of satisfying them for their work and labor, and the dangers they may have encountered. but also for the purpose of inciting others to similar exertions. Judge Peters says: "The general principle is not confined to mere quantum meruit, as to the persons saving; but is expanded so as to comprehend a reward for risk of life and property, labor and danger in the undertaking, as well as a premium, operating as an inducement to similar exertions." La Belle Creole [Case No. 17,165]. Justice Story says: "An enlarged policy, looking to the safety and interests of the commercial world, decrees a liberal recompense to salvors, with a view to stimulate ambition, by holding out what may be deemed an honorable reward." Rowe v. The Brig [Case No. 12,093]. Chief Justice Marshall, delivering the opinion of the court in the case of The Blaireau [Case No. 9,230]. says: "The allowance for such services is intended as an inducement to render them; which it is for the public interest, and for the general interest of humanity, to hold forth to those who navigate the ocean." Sir William Scott, speaking of the principles which should govern in rewarding salvage services. says: "I do not think that the exact service performed is the only proper test for the quantum of reward in these cases. The general interest and security of navigation is a point to which the court will likewise look in fixing the reward. It is for the general interest of commerce, that a considerable reward should be held up; and, as ships are made to pay largely for lighthouses, even where no immediate use is derived from them, from the general convenience that there should be permanent buildings of that sort, provided for all occasions, although this or that ship may derive no benefit from them, on this or that particular occasion. So, on the same principle, it is expedient for the security of navigation that persons of this description, ready on the water and fearless of danger, should be encouraged to go out for the assistance of vessels in distress; and, therefore, when they are paid at all, they should be paid liberally." The Sarah, 1 C. Rob. Adm. 313, in nota.

I think it will also be seen, that the compensation to the wreckers on this coast has usually been much higher than has been decreed to other salvors, under similar circumstances, in other American or in the English courts. Why

is this difference? Why should the Florida wrecker receive a larger compensation than other salvors for similar services? The answer is obvious. There is a great difference in the circumstances and relations of the different salvors themselves. Salvors are, generally, passing voyagers or other persons, who accidentally fall in with the property in peril, and extricate it from danger, without doing injury to their other interests. They incur little or no expense in saving the property, and the salvage they receive is a clear and lucky gain. A nominally small compensation to such persons, under such circumstances, may be really a high reward, and amply sufficient, not only to pay them for all their labor, risk, and exposure, but also to induce others to perform similar services. Not so with the Florida wrecker. He does not accidentally fall in with the property in peril; but he looks out for and goes in search of it. He is no passing voyager; but is stationed for months and years near the place of danger. His exclusive business is to give assistance to vessels in distress, and to save the shipwrecked mariner and the property under his charge. His remuneration for such services is his sole means of living. He incurs heavy expenses, too, in procuring, fitting, manning, and sailing his vessel. These are often, on an average of several years, nearly equal to the salvages received. The interests of commerce and humanity require, that his steady and active devotion to his regular employment be encouraged and rewarded. Upon this subject, I cannot better express myself than in the language of Judge Webb, who presided in this court for nearly twelve years, and who united to a sound judgment much experience of the usefulness of a distinct class of wreckers on this coast. In the case of The Concord [unreported] he said: "These persons are generally men who have devoted themselves exclusively to this particular business, and have expended large sums in preparing good vessels and outfits for the purpose; and it is upon that occupation alone that they depend for a subsistence; and encouragement to such men is an additional consideration, which will ever operate with the court in meting out their reward. The advantages which commerce derives from their services have been too frequently witnessed here to be overlooked by the judge who presides, or to permit him to withhold the inducement necessary to insure a continuance of their employment." In the case of Ashby v. 474 Bales of Cotton [unreported], the property had been saved by transient persons, and the attempt was made to liken it to that of Barker v. 984 Bales of Cotton [unreported]; but the judge said: "The principal difference between this case and that of Barker, (who was a licensed wrecker,) grows out of the fact that he had devoted himself exclusively to the wrecking business. At a large expense in procuring, furnishing, and manning a vessel, he had prepared himself for it; and it was his only means of obtaining a subsistence. To be at all times able to furnish aid to property situated

as this was, it was necessary that he should be for months together unemployed, except in looking out for vessels in distress; and during which time he was subjected to hardships, privations, and expenses, which can only be appreciated by those acquainted with the difficulties to be encountered by the wreckers on the Florida coast. But in this case the situation of the parties is different. They look to other pursuits for a livelihood; and it has only been under the expectation of greater gain that they have been temporarily diverted from those pursuits. It would not be justice, therefore, to measure the compensation by the same standard."

These remarks go far to show, that the rates of salvage allowed in this court are high in appearance only; for, although in the greater number of cases decided here, the services have not been attended with much personal danger to the salvors; nor have they been performed with great labor and fatigue; nor has the property in all instances been in imminent and certain peril; yet the absence of these circumstances, which are generally held to enhance the merit of the salvors, is more than made up, in the case of the regular wrecker, by the expenses he incurs, the privations and hardships he endures, and by the security which his ready presence and active exertions at the scene of danger afford to life and property. Be this as it may, I think it clear, that while the present necessity exists for the employment of a distinct class of men and vessels, in saving life and property exposed to the dangers of shipwreck, sound policy requires that they should be encouraged and supported by decreeing them a liberal compensation for the services they render. If the recompense they receive were not, in some degree, proportioned to the expenses they incur, and the hardships they endure, the dictates of common prudence would prompt them to abandon so precarious, hard, and ungrateful a vocation. If the necessity for the employment of a regular class of wreckers shall hereafter diminish in consequence of an increase of other means and facilities of saving shipwrecked persons and property, then the proportions of salvage, hitherto decreed to them, must be diminished also. Until then, unless I shall be sooner instructed differently by a superior tribunal, I shall continue to vindicate the policy, which seeks to lessen the perils of navigation, by insuring the present steady employment of wreckers on this coast. But their compensation must not be too high, or else it will defeat its own object; and owners, instead of being benefited by their services, will be driven to an abandonment of their property to pay the salvage and expenses. It must be restricted within proper and reasonable limits; and while, on the one hand, it should be sufficiently liberal to afford adequate encouragement to the wrecker, on the other, it should not be so large as to overburden the property charged with it.

Having thus briefly reviewed some of the

leading cases of salvage, and noted the principles that governed their decision, I proceed now to consider the question, what is a reasonable salvage in the present case? The facts of the case have already been detailed. They show that the Montgomery and cargo were exposed to considerable danger. The master might possibly have extricated them, but he could have done so only by a jettison of a large portion of his cargo. Had he by such means gotten his ship afloat, and she had again gone ashore, in her damaged condition, she would probably have been totally lost. My experience of the loss of many vessels on this reef in similar situations induces the belief that the exertions of the actors, if not the very means of saving this ship and cargo, greatly contributed thereto. A prominent feature in the merit of the salvors is the promptness with which their services were rendered. This is a quality highly commended in this court upon grounds of policy. A single anchor opportunely carried out, the assistance of a single wrecking vessel for half an hour, will often save a large amount of property from total loss. "Bis dat, qui cito dat." On the other hand, tardiness in rendering such apparently slight, but really valuable services, is severely reprehended. The shares of the masters of the principal wrecking vessels, in the case of The Howard [Case No. 6,752a], although they had clearly saved the barque and cargo from total loss, were nevertheless forfeited, because they did not give that prompt and early assistance they might have done.

Viewing the case in all its relations, and comparing it with many other similar cases decided in this court, my opinion is, that the one-fourth of the value of the ship and cargo is a reasonable salvage. This proportion will give to the salvors the sum of $10,178, the ship and cargo having been appraised at $40,712. It is to be divided among the several vessels and their crews concerned, as their interests are set forth in the libel. Their great number will reduce the share of each man to about sixty dollars. The salvage upon the cargo must be paid in kind, and the salvage upon the ship in money. The decree will direct the officers of the court to set off and deliver to the libelants, as salvage upon the cargo, 275 bales of cotton of average weight and quality; and that time be given until the 20th of April, for the payment by the master, owners, or underwriters, of $875, as the salvage on the ship.

Another branch of this case still remains to be disposed of. The master has filed a petition, praying the appointment of surveyors, and, if proper, a condemnation and sale of the ship. Surveyors have been appointed, and they have reported that her necessary repairs in this port will cost $7,035; that her present value here is $3,500, and that she will be worth, when repaired, $10,000. They advise that she be condemned and sold, rather than repaired here. But they say that she may be safely navigated to a northern port, after receiving slight repairs, and there repaired at an expense of $5,276. I have no doubt of the jurisdiction of admiralty courts to order surveys, and to decree a condemnation and sale of vessels, whether such proceeding be an incident of some other suit or not. It is a highly useful jurisdiction too; and, if it were more frequently invoked, it would prevent many improper and fraudulent condemnations in distant ports. But the power to order a condemnation and sale of a vessel, on the ground of unseaworthiness, should be cautiously exercised. It is a power susceptible of great abuse. Before making such decree, the judge should be satisfied that it is applied for in perfect good faith towards all parties interested, and that the vessel is so damaged as that no prudent man would think of repairing her. Vide case of The William Henry [unreported], decided in this court, 1839. To apply this rule to the present case: I am satisfied that the application is made in good faith towards all persons interested. The master does not seek the condemnation and sale in a manner that creates suspicions of any sinister motive. He simply submits the question, and prays the advice of the court. I am satisfied, too, that no prudent man would think of repairing her in this port; but I am not satisfied that she may not be navigated to some other port and repaired to an advantage. I cannot, therefore, order the ship condemned, as irreparably unseaworthy, and sold. The clerk will make out the decree in form, according to the directions given, and submit it to the court for final approval.